UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| REBEKAH JACKSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:06-0096 |
| ) | Judge Echols |
| OVERTON COUNTY SCHOOL ) | |
| DISTRICT, OVERTON COUNTY ) | |
| BOARD OF EDUCATION, and ) | |
| LESLEY SMITH, in her official ) | |
| and individual capacities, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM**

Pending before the Court is the Motion for Preliminary Injunction filed by Plaintiff Rebekah Jackson (Docket Entry No. 14). Defendants have filed a response in opposition to that Motion (Docket Entry No. 18).

A hearing was held on Plaintiff's Motion on January 4, 2007, at the conclusion of which the Court denied the request for a preliminary injunction and indicated that the Court's oral ruling would be supplemented by this written decision.

**I. PROCEDURAL HISTORY**

Plaintiff initiated this action on November 30, 2006, with the filing of a Verified Complaint (Docket Entry No. 1). Plaintiff alleges that she was subjected to discrimination and retaliation in violation of Title VI, 42 U.S.C. § 2000d, and 42 U.S.C. § 1983 when she was denied playing time as a member of the girls' varsity basketball team at Livingston Academy High School and then dismissed from the team.

1

In conjunction with her Verified Complaint, Plaintiff filed a Motion for Temporary Restraining Order ("TRO") (Docket No. 3). The day after that filing, December 1, 2006, Judge Trauger held a hearing on Plaintiff's Motion for a TRO and denied the request based upon the "thin record" at the time (Docket Entry No. 11). On December 11, 2006, Plaintiff filed the presently pending Motion for Preliminary Injunction.

## II. FINDINGS OF FACT

Based upon the evidence presented, the Court finds the following to be the relevant facts.

### A. General Overview of Events Leading to Filing of the Lawsuit

Plaintiff is a senior at Livingston Academy High School, the only public high school in Overton County, Tennessee. She is the child of Nathanael Jackson, an African American male, and Jennie Jackson, a Caucasian female.

Since 2004, Plaintiff has been the only African American[1] member of the girl's varsity basketball team. The team is coached by Defendant Lesley Smith ("Coach Smith").

On April 27, 2006, Plaintiff's parents filed[2] a complaint against the Defendant Overton County School District (the "District") with the Office for Civil Rights ("OCR") of the United

---

[1] During the hearing, some suggestion was made that there may have been another African American player on the team. However, no proof was offered as to that fact and the only evidence before the Court is Plaintiff's testimony that she was the only African American player on the team.

[2] Up until September of 2006, Plaintiff was a minor.

2

States Department of Education. In the complaint, the parents alleged that Plaintiff, as well as her brother, Jeremiah Jackson, had been subjected to a hostile educational environment. Specifically, the complaint alleged that the District allowed a racially hostile environment to exist at Livingston Academy because white students were allowed to call minority students the "n" word with impunity. The complaint also alleged that Plaintiff had been discriminated against in regard to her participation on the basketball team in that Plaintiff was given less playing time than other similarly situated students and the coach had threatened to remove her from the team. Coach Smith was not aware the complaint had been filed until she was later interviewed by representatives of the OCR.

The OCR investigated the complaint and, on October 4, 2006, issued a formal Letter of Resolution. That letter indicated the complaint had been investigated pursuant to Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, which prohibits discrimination on the basis of race, color, and national origin by recipients of federal financial assistance. The OCR determined that there was insufficient evidence to substantiate a claim that the District had allowed a racially hostile environment to exist.[3]

---

[3] While a Caucasian student was found to have directed a racial slur at Jeremiah, the OCR determined that the District took prompt remedial action by investigating the incident, documenting the matter in the student's file, cautioning him about making similar comments in the future, and suspending him from the school bus.

3

As for the allegation relating to Plaintiff's treatment on the basketball team, the OCR determined that Plaintiff was afforded less playing time, not because of her race but because other players had stronger skills in certain areas. Additionally, the OCR determined that Plaintiff was not threatened with removal from the team based on her race. Instead, the incident at issue involved the coach's displeasure with Plaintiff's attendance at a horse show instead of at a sub-state championship game during the 2005-2006 season.

The OCR's findings and conclusions were later discussed either at the October or November 2006 Overton County School Board meeting. On November 20, 2006, Coach Smith called Plaintiff to her office at which time she dismissed her from the basketball team allegedly for her poor attitude and poor performance on the court. Believing that the dismissal was in retaliation for her having filed a discrimination complaint with the OCR and not because of poor performance on or off the court, Plaintiff filed the instant lawsuit.

**B. Specific Facts Relevant to Request for Injunctive Relief**

Plaintiff tried out for the junior varsity basketball team during her freshman year at Livingston Academy. While she did not make the squad, Coach Smith later invited her to join the team, and she became a member of the team.

During her sophomore year, Plaintiff tried out for the varsity basketball team and was selected. As a member of the team she did not have to try out for the team as a junior or senior. She

4

remained a member of the team until her dismissal on November 20, 2006.

Plaintiff's performance as a ballplayer is hotly contested. Plaintiff claims that during her junior year at Livingston, she was the basketball team's chief reserve player. She also claims that during the first game of the 2006-2007 season, she was the first player off of the bench as a substitute.[4]

Coach Smith claims that from the start Plaintiff had an "attitude problem" regarding her participation on the team. According to Coach Smith, Plaintiff participated in a pattern of conduct that was disruptive, embarrassing, and divisive. Specifically, Coach Smith claims Plaintiff would become visibly upset, dejected, and uncooperative when she was not allowed to play and would "act out" after basketball games in which she had little playing time or did not get to play at all. Such "acting out" consisted of crying, pouting, refusing to talk to other players on the team, refusing to acknowledge Smith as the coach, and generally making a scene after the game. Allegedly, this type of conduct sometimes took place while the team was celebrating a victory. Coach Smith found this behavior to be selfish and undermined team unity. Some players expressed their concern to Coach Smith as to how they should respond to Plaintiff's emotional actions after she was not allowed to play. Coach Smith claims she repeatedly

---

[4]Plaintiff claims the OCR's finding that Plaintiff played more than some of the Caucasian members of the team, supports her contention that she was an above-average player.

5

counseled Plaintiff about her disruptive conduct but the behavior continued.

As for Plaintiff's basketball ability, Coach Smith claims Plaintiff was never the team's "chief reserve" player. In fact, Coach Smith testified Plaintiff was one of the weaker players on the Livingston Academy High School girl's basketball team. Nevertheless, Coach Smith allowed her to play in games when the opportunity arose.

The parties also dispute how often Plaintiff actually played. Plaintiff claims that in her junior year she played in all but two of the approximately thirty games. Coach Smith claims Plaintiff did not play in twelve of the games that season.

It is undisputed that during her junior year (2005-2006), Plaintiff missed an important sub-state basketball game at the end of the season which upset Coach Smith. According to Coach Smith, Plaintiff did not call or offer any excuse for her absence from the game until the next school year began at which time she told Coach Smith that she had to go with her family to a horse show since her parents did not want her remaining at home unsupervised.

Basketball practice for Plaintiff's senior year began on October 30, 2006, with Plaintiff thereafter participating in team practices and seven pre-season scrimmage games. Plaintiff also was on the basketball team for the first two games of the regular season.

The first game of the 2006 - 2007 season was on November 16, 2006, against Antioch High School. In that game, Plaintiff played

6

as a guard for approximately nine minutes.[5]  Plaintiff admits that it was not her best game and that she made mistakes.  Coach Smith stated in her Declaration that during the time she played, Plaintiff was responsible for four turnovers, missed the only shot she took, and had no rebounds.

The next game was played on Friday, November 18, 2006, against Loudon High School. During that game, Coach Smith did not play Plaintiff as she felt that Loudon High School had a similar team to Antioch and Coach Smith believed Plaintiff would not perform well.

After the Loudon High School game, Coach Smith says Plaintiff was dejected and displayed a poor attitude because she was not allowed to play. This is the same type of attitude and conduct Plaintiff had exhibited throughout her time as a basketball player at Livingston Academy and which Coach Smith had counseled her about in the past.

Over the weekend following the Loudon County game, Coach Smith contemplated Plaintiff's continued participation on the basketball team.  Coach Smith knew that some of the younger team members had developed their basketball skills beyond Plaintiff's ability, and she planned to play them more.  As a result, Plaintiff would be playing less, not more in the games during the season.  Coach Smith decided to dismiss Plaintiff from the team because of her poor performance as a basketball player and because of her divisive and

---

[5]Coach Smith claims it was approximately this amount of time, while Plaintiff remembers playing for two quarters.

7

selfish attitude. She called the principal of Livingston Academy, Gary Ledbetter ("Ledbetter"), and explained what she wanted to do and why. Ledbetter approved of her decision. Coach Smith asked Plaintiff to come to her office on Monday, November 20, 2006, and she informed her of her decision to dismiss her from the team and the reasons for her decision.

Coach Smith states her decision to dismiss Plaintiff from the basketball team was based solely upon Plaintiff's poor performance as a basketball player and her poor attitude. Coach Smith viewed Plaintiff's selfish attitude as disruptive, divisive, and detrimental to the team as a whole and that it undermined her ability and authority as a coach with the other players. She believes each player must put the team ahead of personal desires, that players must support other team members, that team unity is very important, and that the team should win and celebrate together or lose and be disappointed together. If Plaintiff, a senior on the basketball team, was allowed to continue her pattern of "acting out" whenever she was not satisfied with her playing time in a game, Coach Smith believed it would set a bad example and be detrimental to the team. Moreover, Coach Smith had concluded that Plaintiff's attitude would not improve and would only worsen because several of the younger players had progressed beyond Plaintiff and would receive more playing time during the season.

In the past Coach Smith dismissed Brittany Ray, a Caucasian player on the Livingston Academy High School basketball team, for

8

reasons "strikingly similar" to those for which Plaintiff was dismissed – poor performance and poor attitude.

At the time Coach Smith decided to dismiss Plaintiff from the team, she was aware that Plaintiff's parents had filed a charge of discrimination with the OCR. Coach Smith first became aware of the charges when she was interviewed by investigators from the OCR in September 2006, and was aware of its decision in the early part of October 2006, when she was called at home by Principal Ledbetter and informed of the results. However, Coach Smith was not aware that Plaintiff's father had appealed the OCR's determination, or that he had filed another charge in which he claimed that Coach Smith had informed her senior players to keep their parents "off her back" and told the players not to report her request to their parents.[6]

Defendants first became aware that Plaintiff's father had appealed the OCR decision and filed another charge on November 21, 2006, after Coach Smith had dismissed Plaintiff from the team and approximately fifteen minutes before a meeting between school administrators, Plaintiff, her parents, Coach Smith, and others on the coaching staff. While the goal of the meeting was to address any concerns that the Plaintiff and her parents may have had regarding Plaintiff's dismissal from the team, the meeting was adversarial and not productive.

---

[6]This allegedly occurred during Coach Smith's annual dinner meeting with the seniors to discuss team goals and leadership.

9

Since being terminated from the team, Plaintiff has missed approximately fifteen games and two tournaments. According to Plaintiff, the team has done very well in her absence.

As a result of being dismissed from the team, Plaintiff has suffered from depression and is undergoing therapy. Basketball has been an important and driving force in her life and she greatly misses being on the team. Plaintiff testified she loves basketball and, in fact she said she "ate, breathed, and slept basketball." Plaintiff's goal has been to receive a college basketball scholarship and ultimately play in the WNBA.

### III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 65(b), the Court may grant a preliminary injunction if it clearly appears from specific facts shown by testimony, affidavits or a verified complaint that immediate and irreparable injury, loss or damage will result to the applicant. In deciding whether to grant a preliminary injunction, the Court must consider four factors: (1) whether the party seeking the order has a strong likelihood of prevailing on the merits of the case; (2) whether the moving party will suffer irreparable injury if the order is not entered; (3) the potential harm the order would cause others; and (4) the public interest. See Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir. 2000). These factors "do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief," Frisch's Rest. Inc. v. Shoney's, Inc., 759 F.2d 1261, 1263 (6th Cir. 1984), nor is

10

any one factor controlling. Gonzales v. Nat'l Bd. of Med. Examiners, 225 F.3d 620, 625 (6th Cir. 2000).

## IV. APPLICATION OF LAW

As stated at the close of the evidentiary hearing, the Court finds from the evidence which has been presented that the factors to be considered under Rule 65 are relatively evenly balanced between the Plaintiff and the Defendants.

## A. Likelihood of Success on the Merits

"In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." Six Clinics Holding Corp., II v. CAFCOMP Systems, 119 F.3d 393, 407 (6th Cir. 1997). "However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair grounds for litigation and thus for more deliberate investigation." Id.

Plaintiff's primary claim for purposes of her request for a preliminary injunction is that she was retaliated against in violation of Title VI.[7] Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity

---

[7]Plaintiff lists this as her primary claim. She also has a claim for retaliation under 42 U.S.C. § 1983. Under either statute, the analysis would be the same for present purposes.

11

receiving Federal financial assistance." 42 U.S.C. § 2000d.[8] "To make a claim for Title VI retaliation, [Plaintiff] must show that she engaged in protected activity; (2) that [Defendants] took a material adverse . . . action against her, and (3) that a causal connection existed between the protected activity and the adverse action." Peters v. Jenney, 327 F.3d 307, 320 (4th Cir. 2003). The third element pertaining to causal connection in a retaliation case may be proved either by direct evidence or the burden shifting scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. at n.15.

In this case, the parties do not dispute the first two elements. Plaintiff has presented evidence showing that she engaged in protected activity because, when she was a minor, her father filed a complaint with the OCR on her behalf relating to her participation on the Livingston Academy basketball team. Plaintiff has also shown an adverse action inasmuch as she was dismissed from the team.

What is disputed is the causal connection between the exercise of a protected activity and the adverse action. The evidence is far from definitive on this issue.

The evidence can be viewed as suggesting retaliation because Plaintiff was discharged from the basketball team not long after the Defendants learned the OCR determined there was insufficient evidence to support her father's complaint of discrimination. This

---

[8]There is no contention in this case that either Overton County schools or Livingston Academy do not receive federal funds.

12

raises the possibility that, with the OCR's finding, the Defendants thought they were in the clear and could therefore terminate Plaintiff from the team without fear of repercussion. Such a view of the evidence supports the causal connection element since it suggests a close proximity in time between the protected activity and the adverse action. See, Asmo v. Keane, Inc., 2006 WL 37020902 at *4 (6th Cir. 2006)(collecting cases which indicate temporal proximity can establish a causal connection between the protected activity and the unlawful adverse action in a retaliation case).

The evidence relating to the timing of events could alternatively be viewed as suggesting no connection between Plaintiff's discharge from the team and her father's filing of a complaint with the OCR. The complaint was first filed in April of 2006. Coach Smith learned of the complaint when she was interviewed by OCR investigators in September 2006. She learned of the dismissal of the complaint in early October 2006. Nevertheless, Coach Smith allowed Plaintiff to remain on the team, participate in numerous practices and several scrimmage games, play nine minutes the first game of the season and remain on the team through the second game, although she did not play. Such a view of the evidence is inconsistent with an intention to retaliate once the charges with the OCR had been dismissed. In addition, none of the Defendants knew of the appeal of the OCR decision by Plaintiff's father or the father's filing of an additional charge of discrimination until *after* Plaintiff had been dismissed from the team.

13

Moreover, Defendants have presented a legitimate non-retaliatory reason for Plaintiff's dismissal by her basketball coach, Defendant Leslie Smith, to wit: Plaintiff's poor performance as a guard on the basketball court and her continuing pattern of pouting, complaining, and general bad attitude when she was not allowed to play in games or allowed to play as much as she thought she deserved. This reason is supported by proof that Coach Smith dismissed a Caucasian player from the team, Brittany Ray, under "strikingly similar" circumstances.

Although Plaintiff alleges the Coach's reason for Plaintiff's dismissal is pretextual, based on the record before the Court there is no proof to support Plaintiff's allegation. The proof on the issue does not weigh in Plaintiff's favor. At best, the proof is evenly balanced on Plaintiff's likelihood of success on the merits. Therefore it will be for the jury to determine this issue. At this point, either party could ultimately prevail on the merits.

**B. <u>Irreparable Harm To Plaintiff</u>**

As indicated in the factual findings, basketball is a very important aspect of Plaintiff's high school experience. She testified she loves basketball, thinks about it constantly, and keeps up with the professional women's teams. Her family is very supportive of her participation on the girl's high school basketball team. Obviously, if she is unable to return to the team, her high school experience will be diminished. In Plaintiff's mind, there is no adequate substitute for not being allowed to be a member of the basketball team and this experience

14

will be lost forever. In addition, Plaintiff's dream is to obtain a scholarship to play college ball and one day play in the WNBA.

Plaintiff's prospects of obtaining a scholarship to play basketball at the collegiate level may be reduced because she is no longer on the team, but this possibility is speculative, especially in view of Coach Smith's testimony about her limited basketball skills. Accordingly, such injury may not be considered as irreparable harm to Plaintiff. See, Butler v. NCAA, 2006 WL 2398683 at *4 (D. Kan. 2006)(loss of scholarship to play football at University of Kansas not irreparable harm even though it diminished prospects for a professional career because the harm was speculative).

What is not speculative, however, is that Plaintiff has been emotionally injured to some degree by her dismissal from the team. She has been depressed and has attended counseling sessions. Money damages will not make her whole by bringing back her experience as a senior on the girl's high school basketball team. In this respect, the harm she will suffer is irreparable. The second factor in the analysis therefore weighs in favor of Plaintiff.

### C. Potential Harm To Others, Including The Defendants

As a third factor, the Court must consider whether the issuance of a preliminary injunction as requested by Plaintiff will cause "substantial harm to others." Leary, 228 F.3d at 736. "This requires a court to balance the harm a plaintiff would suffer if [her] request for a preliminary injunction was denied with the harm the defendants would suffer if they were to be temporarily

15

enjoined." Sawyer, 2006 WL 1638537 at *8. "It also requires a court to assess the impact a preliminary injunction might have on relevant third parties." Id.

Entry of an injunction requiring Plaintiff to be placed back on the team will cause harm to Defendants and others. In particular, Coach Smith's authority and decision-making ability would be substantially undermined. As head coach, Coach Smith made a determination to dismiss Plaintiff from the team because she believed the action was in the best interests of the team. If this Court were to countermand her decision, her authority would be diminished and her decision would be subject to ridicule. Coach Smith testified that Plaintiff's temper tantrums, sulking, and crying were disruptive and divisive to the moral of the team. As coach, she expected the seniors to be leaders and set an example for the younger players. She viewed Plaintiff's actions as selfish and undermining to the unity of the team. Further, she had counseled Plaintiff in the past in an effort to correct Plaintiff's behavior. In addition, according to Coach Smith, some of the younger players had progressed ahead of Plaintiff in their basketball skills, and she planned to play them instead of Plaintiff. Therefore, Plaintiff would be playing less, not more, and she did not want to have to continue to contend with Plaintiff's disruptive behavior. In this connection, some of the players had mentioned to her the problems caused by Plaintiff's actions. Obviously, an important part of coaching is the freedom

16

to make tough decisions and not be second-guessed by those unfamiliar with the strengths and abilities of those in her charge.

Others also could be conceivably hurt by the issuance of an injunction, including the remaining players on the team. This is of particular concern since "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." University of Texas v. Camenisch, 451 U.S. 390, 395 (1981); accord, Six Clinics Holding Corp. II v. Cafcomp Sys. Inc., 119 F.3d 393, 400 (6th Cir. 1997).

Plaintiff has now missed approximately fifteen regular games and two tournaments. Presumably the team has coalesced into a different team in her absence. If Plaintiff were to be thrust back onto the team this would change the dynamics of a squad which Plaintiff herself admits is playing well. Moreover, regardless of whether Plaintiff was the "chief reserve" as she claims, or a relatively poor substitute player as Coach Smith claims, her return will necessarily displace whoever has filled her slot.

The balance of harm, like the likelihood of success on the merits, is relatively equal as between the parties.

**D.  Public Interest**

The last factor in determining whether to grant a preliminary injunction "asks whether the public interest is advanced in issuing" the order. National Hockey League Players Ass'n v. Plymouth Whalers Hockey Club, 372 F.3d 712, 720 n. 4 (6th Cir.

17

2003). This has been described as a "somewhat nebulous" factor. <u>Sawyer</u>, 2006 WL 1638537 at * 8.

On the one hand, the public interest is undoubtedly advanced when the Court acts to eradicate racial discrimination and retaliation for complaining about discriminatory actions. However, that precept presupposes that there has been unlawful discrimination and/or retaliation. If the Court could find that retaliation in fact occurred, this factor would tip the balance in Plaintiff's favor but the record is insufficient to support such a conclusion at this time.

On the other hand, the Court does not believe it to be in the public interest for a federal judge to insert himself or herself into the role of the basketball coach in determining when and how much playing time a player should have and whether the coach was justified in dismissing a player from the team because of inappropriate conduct and poor performance. From the slight evidence presented, it appears the Defendant coach is qualified and experienced. She played on the women's varsity basketball team at Vanderbilt University, which produces top players. She has been coaching girl's high school basketball for several years. However, the Court knows virtually nothing about this year's team at Livingston Academy or the dynamics between the coach and players and between the players. Although there have been allegations of racial animus by the coach against the Plaintiff, there has been no proof of it, and the Defendants have presented proof of non-discriminatory reasons for the actions of the coach, including the

18

dismissal of Plaintiff from the team.  From the temporal connection between the disclosure of the OCR's decision and the dismissal, it appears that Plaintiff's retaliation claim may be somewhat stronger, but not so strong as to justify granting an injunction requiring Defendants to put Plaintiff back on the team or forfeit the balance of games on the schedule.

The basketball team is well into its season and is doing very well.  If Plaintiff were to be placed back on the team, should she merely be relegated to sitting on the bench and not playing, something she herself and her father have previously complained about?  If she is not granted playing time, would this now be embarrassing to Plaintiff and the coach, and would this situation cause more problems or cause a distraction to the team?  If she is to play, how many minutes should she play?  How much playing time is enough time?  When and under what should she be substituted?

These and many other questions are the imponderables which the Court is unable to answer but which necessarily arise during the course of a basketball game and season.  It is in the public's interest that these questions be answered by the person which the school has chosen to head its basketball program, particularly where, as here, the Court cannot at this point make an ultimate conclusion as to whether the coach violated the law by discriminating and/or retaliating against Plaintiff for exercising a statutory right to file a claim of discrimination.

19

**E. Summary of Factors**

As the foregoing makes clear, the Court is of the view that the factors to be considered in weighing the propriety of a preliminary injunction are relatively balanced as between the parties. The Court finds the Plaintiff has failed in her burden of proving that the facts anc circumstances presented clearly demand the extraordinary remedy of a preliminary injunction. <u>Overstree v. Lexington-Fayette Urban County Govt.</u>, 305 F.3d 566, 573 (6th Cir. 2002). Accordingly, the Court finds the requested preliminary injunctive relief to be unwarranted.

## V. CONCLUSION

For the foregoing reasons, as well as those expressed at the conclusion of the evidentiary hearing on January 4, 2007, Plaintiff's Motion for Preliminary Injunction (Docket Entry No. 14) will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE